UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER A BAGATELOS, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>UMPQUA BANK,<br><br>　　　　　Defendant. | Case No. 23-cv-02759-RS<br><br>**ORDER PERMITTING FURTHER SUBMISSION TO ADDRESS STANDING** |

## I. INTRODUCTION

This case arises from the same underlying facts alleged in *Camenisch v. Umpqua Bank*, Case No. 3:20-CV-05905-RS. Plaintiffs contend they were members of the putative class proposed in the original *Camenisch* complaint, which was filed by the same plaintiffs' counsel. The *Camenisch* plaintiffs allege they were victims of an alleged real estate investment Ponzi scheme carried out by Kenneth Casey through two companies he founded and controlled—Professional Investors Security Fund, Inc. and Professional Financial Investors, Inc. (collectively "PFI").[1] Casey is deceased, and PFI filed bankruptcy. Investors recovered only a portion of their investments in the bankruptcy. The *Camenisch* plaintiffs therefore seek to recover damages from Umpqua Bank, the financial institution that handled all of PFI's accounts.

---

[1] Any potential legal distinction between the two entities is not relevant to the issues presented in this motion, and defendants have not argued otherwise.

Unlike *Camenisch*, this is not a class action. Plaintiffs are eighteen individuals and trust entities who participated in real estate investments offered by PFI by wiring funds to an escrow company to purchase percentage ownership interests in specific apartment buildings or commercial office complexes—giving them "tenancies-in-common" or "TICs" in those properties. As discussed below, although these plaintiffs contend their claims were originally encompassed in the *Camenisch* action, the complaint lacked allegations that reasonably could be construed as reaching the TIC investments and these plaintiffs' claims, despite a broadly worded class description.  Indeed, when the *Camenisch* plaintiffs moved for class certification, they proposed a class definition that unambiguously did not include the TIC investors. These plaintiffs filed this action shortly after entry of the order granting class certification in *Camenisch*, which excluded them.

Plaintiffs contend the percentage interests they received in each property did not reflect the actual percentage that the funds they contributed bore to the total sales price, because under the investment agreements, PFI also took a percentage ownership, in exchange for the expectation that it was managing the investment over the longer term.[2]

Plaintiffs assert PFI's alleged financial improprieties mean it never actually contributed the sums it was required to provide as consideration for its percentage ownership in the TICs. Plaintiffs also argue the monies they should have received from PFI as returns on their investments (prior to the sale of any of the TIC properties) were commingled with other investor funds as part of the overall fraudulent Ponzi scheme. Like the *Camenisch* plaintiffs, the plaintiffs here seek to hold Umpqua liable for having aiding and abetted the alleged wrongdoing of PFI and its principals. Umpqua seeks summary judgment on any of three grounds, each of which is

---

[2] PFI apparently also took an *additional* percentage of the rental incomes from each property to compensate it for performing the typical services of a property manager in the short term. There is no dispute that PFI's percentage taken from rental payments—in the 3-4 percent range—is consistent with the amounts typically charged by property managers, and it is not an issue in this litigation.

addressed below. Because it appears plaintiffs lack standing at this juncture, but that the defect may be curable, plaintiffs will be given the opportunity to address that issue and no judgment will be entered at this time.

## II.  BACKGROUND[3]

There is little dispute that PFI started out as a legitimate, profitable, business that focused on acquiring and operating commercial real estate in Marin and Sonoma Counties. PFI's model was to use investor-sourced funds to purchase and operate properties, with the ultimate goal of selling them after they had appreciated. PFI ultimately acquired 71 properties, estimated to be worth $550 million when it eventually filed for bankruptcy.

PFI offered five different forms of investment vehicles over the years. Initially, PFI gave investors the opportunity to become limited partners in partnerships that acquired and managed specific properties. Later PFI offered second deeds of trust on properties it acquired in its own name, with commercial financing. PFI eventually also offered unsecured promissory notes, with higher interest rates than provided by the deeds of trust. In 2012, PFI began offering membership interests in limited liability companies, which like the earlier limited partnerships, were formed for specific properties. Finally, PFI offered the investments at issue in this action—interests in tenancies-in-common, which enabled investors who were selling their own investment properties to acquire title directly and thereby take advantage of the IRS's "1031 exchange" rules.[4]

Although PFI apparently began as a legitimate enterprise, at some point its revenues became insufficient to pay its debts and it began relying on new investments to help pay expenses. At that point, in the view of plaintiffs here and in *Camenisch*, it became a Ponzi scheme.

---

[3] This background includes material from the record established in *Camenisch* in conjunction with the class certification motion and Umpqua's initial summary judgment motion in that action. Both parties' briefs in this matter expressly rely on that record.

[4] A "1031 exchange" is a transaction structured under IRS regulations to permit deferral of taxation on capital gains.

1    In May of 2020 Casey died. His former wife, apparently the beneficiary of his estate, asked
2    an attorney to help transition ownership of the business. The attorney immediately recognized PFI
3    was insolvent and could not legitimately meet its monthly obligations to investors. Further
4    investor payments were frozen, the SEC was alerted, and the companies were forced into
5    bankruptcy. All of the companies' officers resigned. The Umpqua employee with primary
6    responsibility for PFI's accounts—its so-called "private banker"—retired. PFI's president, who
7    had worked with Casey, later pled guilty to defrauding investors and embezzling over $26 million
8    of investor money from the companies' bank accounts and is currently serving a 12-year prison
9    sentence.

### III.  LEGAL STANDARDS

#### A.  Summary judgment

Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323 (citations and internal quotation marks omitted). If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which that party bears the burden of proof at trial. *Id*. at 322-23.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the entry of summary judgment, the non-moving party must bring forth

material facts, *i.e.*, "facts that might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 588 (1986).

IV.  DISCUSSION

A.  Standing

Umpqua contends plaintiffs lack standing to bring this action because under the terms of PFI's bankruptcy plan, potential claims against third parties, such as those asserted against Umpqua here, were contributed to the PFI Trust, an entity formed as part of the bankruptcy plan, unless disclaimed in writing by the PFI trustee. Plaintiffs do not dispute that they only have standing if the PFI trustee made a written disclaimer of the claims they bring here.

The trustee did issue a written disclaimer of the claims asserted in *Camenisch.* It stated, "[T]his is to advise you of my decision as PFI Trustee to disclaim any and all Contributed Claims that are pursued in the lawsuit pending in the United States District Court for the Northern District of California styled as Camenisch v. Umpqua Bank, Case No. 20-cv-05905-RS." (Declaration of Kasey Curtis Decl., Ex. 51., Dkt. No. 85-5).

Plaintiffs insist their claims as TIC investors were within the scope of the *Camenisch* litigation at the time the trustee executed that disclaimer, and it therefore provides them standing to pursue those claims in this action. The allegations of the *Camenisch* complaint, however, were never broad enough to encompass claims of TIC investors. The First Amended Complaint in *Camenisch* asserts that alleged victims of the "Ponzi scheme" invested in PFI's real property through "various mechanisms," but specifically listed only "loans secured by junior deeds of trust in the property, loans secured by PISF's interest in limited partnerships that owned the property, and by purchasing membership in LLCs that owned the property." *Camenisch* FAC, para. 17.

Moreover, the *Camenisch* complaint repeatedly described the essence of the alleged

United States District Court
Northern District of California

scheme. "[T]he business was depositing money from new investors into company accounts and then using those funds to pay previous investors and for Casey's personal benefit." *Camenisch* FAC, para. 2. "[E]xisting investors were paid in large part through new investors' contributions . . . ." *Camenisch* FAC, para. 19. "[I]t was apparent Casey's businesses lacked sufficient cash flow to meet their monthly obligations and had been unlawfully diverting new investors' money to pay previous investors." *Camenisch* FAC, para. 20. PFI's "bank accounts showed that money deposited from new investors were being commingled with other investors' funds, were being used to pay existing investors, and were being used to pay Casey's personal expenses." *Camenisch* FAC, para. 29(k). Nothing in the allegations describes the basis of the TIC investors' claims, as it is undisputed none of them paid any money directly to PFI, and none of their investment funds were ever deposited at Umpqua. Furthermore, when moving for class certification, the *Camenisch* plaintiffs never suggested they were seeking certification of only a subset of the potential class members/claims implicated by the complaint.

Plaintiffs here invoke the proposed class definition of the *Camenisch* complaint: "All persons who invested money with and/or loaned money to Kenneth J. Casey, Professional Financial Investors, Inc. and/or Professional Investors Security Fund, Inc." It may be true that the TIC investors invested money "with" PFI in the sense that PFI set up the TICs and had an interest in them. Nevertheless, both the absence of any other allegations in the complaint describing the operation of the TICs or any involvement by Umpqua therein, and the plethora of allegations describing a scheme in which the plaintiffs' money was paid to PFI and deposited at Umpqua, foreclose the argument that the TIC investors' claims were ever within the scope of the *Camenisch* complaint. Accordingly, the claims the *Bagatelos* plaintiffs are attempting to pursue in this action belong to the PFI trust, and plaintiffs lack standing to proceed at this juncture.

Plaintiffs further contend that even if they lack standing, summary judgment on that basis is not an appropriate remedy. Rather, plaintiffs contend, they must be given a reasonable opportunity to obtain ratification from the PFI trustee of their pursuit of this litigation. *See* Fed. R. Civ. P. 17(a)(3) ("The court may not dismiss an action for failure to prosecute in the name of the

real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.") Umpqua did not respond to this point, and it appears it may have merit. Accordingly, within two weeks of the date of this order, plaintiffs may submit any ratification they may obtain from the PFI trustee or documents to effect a substitution or joinder if appropriate. Within one week thereafter, Umpqua may file a response, not to exceed 8 pages, setting out its position as to whether any standing issue then remains.

B. Potential liability

In the absence of standing, the court lacks jurisdiction to rule on the merits. Nevertheless, in the interests of judicial efficiency, the parties are advised that if the standing analysis above were determined to be erroneous, or if plaintiffs are able to cure the problem through ratification or otherwise, Umpqua would then be entitled to summary judgment in its favor on the merits.

Umpqua contends the *Bagatelos* plaintiffs have not shown, and cannot show, that their investments were within the scope of the "Ponzi scheme," as to which Umpqua faces potential liability under California law for "aiding and abetting" the underlying breaches of fiduciary duty by PFI to plaintiff. In opposition, the *Bagatelos* plaintiffs stress evidence showing the extent to which PFI commingled funds, including those which arguably should have been paid out to them as returns on their investments in the TICs.

The issue here, however, is not whether the *Bagatelos* plaintiffs might have claims against PFI arising from such co-mingling and/or other breaches of fiduciary duty, but whether the *Bagatelos* plaintiffs have claims *against Umpqua* for purportedly aiding and abetting such breaches. As reflected in the orders entered in *Camenisch*, there is at least a triable issue of fact as to whether the alleged conduct of Umpqua's employees would support an inference the bank had actual knowledge the investments of those plaintiffs were diverted in the so-called "Ponzi scheme." The dispositive difference in this action is that plaintiffs have made no showing—and

indeed do not even argue—that any of the funds they invested were ever deposited into Umpqua accounts or otherwise processed by the bank.

Plaintiffs' theory here boils down to a claim that because PFI's operations as a whole at some point became a Ponzi scheme, and because funds were intermingled among all PFI accounts held at Umpqua, all PFI investors stand in the same position with respect to claims against Umpqua. The *Camenisch* plaintiffs survived Umpqua's motion for summary judgment, however, largely because Umpqua had handled the funds they invested. The circumstantial evidence from which an inference of actual knowledge could be drawn included the fact that Umpqua employees directly participated in the transfers of funds from new investors into payment accounts for earlier investment properties as well as into personal accounts belonging to Casey and the PFI president. Umpqua's direct handling of investment funds also potentially satisfies the "substantial assistance" prong of aiding and abetting liability. *See Casey v. U.S. Bank Nat. Assn.*, 127 Cal. App. 4th 1138, 1144 (2005) (Liability may be imposed for aiding and abetting the commission of an intentional tort if the person "knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act.")

In contrast, plaintiffs here do not, and cannot, dispute that the funds they invested were never in Umpqua's hands. That PFI may have had accounts at Umpqua containing funds that allegedly should have been paid out to these plaintiffs as *returns* on their TIC investments is not equivalent to the allegations in *Camenisch* that the principal investments were deposited into Umpqua accounts and then misapplied and comingled.

While the evidence was sufficient in *Camenisch* to create a triable issue of fact that Umpqua knew PFI was engaged in a Ponzi scheme with respect to those class members, whose investments were deposited directly into Umpqua accounts, there is no basis to conclude Umpqua faces aiding and abetting liability for the alleged wrongs PFI committed against the *Bagatelos* plaintiffs. Accordingly, even if plaintiffs can establish standing, summary judgment against them will be appropriate.

Finally, Umpqua also insists plaintiffs have no cognizable damages because they received

the benefit of their bargains—percentage ownership in the respective TICs. If plaintiffs are able to establish standing, Umpqua will not be entitled to judgment on this additional ground.

While Umpqua cannot be held derivatively liable to these plaintiffs under an "aiding and abetting" theory, that is *not* because plaintiffs were not damaged by PFI's alleged wrongdoing. PFI's promise was that it would contribute to the TICs and manage the investments. Its alleged diversions of funds and intermingling of profits, and failure to make promised contributions, potentially caused damage to plaintiffs, even though they received ownership in the properties. Umpqua's argument that plaintiffs suffered no cognizable damages exist is not tenable, even though it has shown it does not face liability for such damages.

## V. CONCLUSION

The parties may make the further submissions set out above. A final ruling on standing is deferred pending receipt of those submissions, and a ruling on the merits will not issue until and unless there is a determination that standing exists.[5]

**IT IS SO ORDERED**.

Dated: June 25, 2024

_____
RICHARD SEEBORG
Chief United States District Judge

---

[5] Umpqua's motion to file under seal a document produced by non-party Banc of California (Dkt. No. 86) is granted. Banc of California has made an adequate showing the document includes its confidential information. Additionally, nothing in the document is material to the analysis in this order.